**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|  |  |
|---|---|
| JONATHAN ALFORD, individually and on behalf of all others similarly situated, | **CIVIL ACTION NO**. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| UNITED COMMUNITY BANKS, INC., JIMMY C. TALLENT, GUY W. FREEMAN, ROBERT L. HEAD, JR., W.C. NELSON, JR., ROBERT BLALOCK, CATHY COX, HOYT O. HOLLOWAY, JOHN D. STEPHENS, TIM WALLIS, BENEFITS ADMINISTRATIVE COMMITTEE OF UNITED COMMUNITY BANKS, INC., CATHERINE HAMBY and DOES 1-10. | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Jonathan Alford ("Plaintiff"), a participant in the United Community Banks, Inc. Profit Sharing Plan (the "Plan") during the proposed Class Period (defined below), alleges as follows on behalf of the Plan, himself and a class of all others similarly situated:

1

## INTRODUCTION

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries.

2.     Plaintiff was a participant in the Plan during the Class Period, during which time the Plan held interests in the common stock of United Community Banks, Inc. (also referred to herein as "UCBI" or the "Company").   Plaintiff's retirement investments in the Plan during the Class Period included UCBI stock.

3.     401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals.   An employee participating in a 401(k) plan may have the option of purchasing the common stock of his or her employer, often the sponsor of the plan, for part of his or her retirement investments.   Common stock of UCBI was one of the investment alternatives of the Plan throughout the Class Period.

4.     Plaintiff alleges that Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties owed to the Plan, to him and to the other participants and beneficiaries of the Plan in violation of ERISA §§ 404(a) and 405, 29 U.S.C. §§ 1104(a) and 1105, particularly with regard to the Plan's holdings of UCBI stock.

2

5.      Specifically, Plaintiff alleges in Count I that Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to the Plan, him, and the proposed Class by failing to prudently and loyally manage the Plan's investment in Company equity by:  (1) continuing to offer UCBI common stock as a Plan investment option when it was imprudent to do so; (2) failing to provide complete and accurate information to Plan participants regarding the Company's financial condition and the prudence of investing in Company stock; and (3) maintaining the Plan's pre-existing significant investment in UCBI equity when Company stock was no longer a prudent investment for the Plan.  These actions/inactions run directly counter to the express purpose of ERISA pension plans, which are designed to help provide retirement funds for participants.  *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

6.      Count II alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and their participants' best interests in mind.

7.      Count III alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom

management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering UCBI stock as an investment option and investing Plan assets in UCBI stock when it was no longer prudent to do so.

8.     Plaintiff alleges that Defendants allowed the imprudent investment of the Plan's assets in UCBI stock throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent because, as explained in detail below and among other things: (a) the Company and its primary subsidiary United Community Bank (the "Bank") were exposed to substantial losses from souring loans in the Company's residential and commercial construction loan portfolios; (b) the Company was overly exposed to losses due to its over-concentration of construction loans in the Atlanta metropolitan area; (c) the Company was forced to continually increase its provision for loan losses; and (d) as a consequence of the above, Defendants knew or should have known that the Plan's continued significant investment of employees' retirement savings in Company stock would inevitably result in substantial losses to the Plan and, consequently, to the Plan's participants.

9.     This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132.  Because Plaintiff's claims are brought for the benefit of the Plan, inclusive of all participants with accounts invested in Company stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for relief to the Plan for breaches of fiduciary duty such as those alleged herein, Plaintiff brings this action individually and as a class action on behalf of the Plan and all participants and beneficiaries of the Plan during the proposed Class Period.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and UCBI has its principal place of business in this district.  Further, many of the Plan's participants are located in or within close proximity to this district.

## PARTIES

### Plaintiff

12.    Plaintiff Jonathan Alford is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held UCBI shares in his retirement investment portfolio during the Class Period.

### Defendants

#### UCBI

13.    Defendant UCBI was the sponsor and administrator of the Plan. *See* 2009 Form 5500 for the Plan, filed with the Department of Labor and the Department of the Treasury (the "2009 Form 5500").  As further described below, UCBI was a named fiduciary of the Plan and exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.  UCBI bore ultimate responsibility for monitoring the performance of the Plan's investment options and changing such investment options.  At all relevant times, the Company acted through its Board of Directors (the "Board") and certain officers/employees, including without limitation, the Benefits Administrative Committee of United Community Banks, Inc. (the "Administrative Committee").

**Director Defendants**

14.     Defendant Jimmy C. Tallent ("Tallent") served as President, Chief Executive Officer ("CEO") and a member of the Board during the Class Period. Defendant Tallent was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

15.     Defendant Guy W. Freeman ("Freeman") served as Executive Vice President and Chief Operating Officer ("COO") during the Class Period. Defendant Freeman was also a member of the Board during the Class Period. Defendant Freeman was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

16.     Defendant Robert L. Head, Jr. ("Head") served as Chairman of the Board during the Class Period.  Defendant Head was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

17.    Defendant W.C. Nelson, Jr. ("Nelson") served as Vice Chairman of the Board during the Class Period.  Defendant Nelson was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

18.    Defendant Robert Blalock ("Blalock") served as a member of the Board during the Class Period.  Defendant Blalock was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

19.    Defendant Cathy Cox ("Cox") served as a member of the Board during the Class Period.  Defendant Cox was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

20.    Defendant Hoyt O. Holloway ("Holloway") served as a member of the Board during the Class Period.  Defendant Holloway was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A),

because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

21.     Defendant John D. Stephens ("Stephens") served as a member of the Board during the Class Period.  Defendant Stephens was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

22.     Defendant Tim Wallis ("Wallis") served as a member of the Board during the Class Period.  Defendant Wallis was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

23.     Defendants Tallent, Freeman, Head, Nelson, Blalock, Cox, Holloway, Stephens and Wallis are collectively referred to as the "Director Defendants."

**Administrative Committee Defendants**

24.     Defendant Administrative Committee was the named Plan Administrator and was a named fiduciary of the Plan.  *See* Plan Document §§ 1.14, 1.22 and 7.2, incorporated by reference into United Community Banks, Inc. Registration Statement (Form S-8) (April 24, 2002) and attached as Exhibit A

hereto.  The Administrative Committee was comprised of individuals appointed by the Company through the Board and delegated certain duties with respect to Plan administration.  *See id*.

25.    Defendant Catherine Hamby ("Hamby") served as the Company's Manager-Benefits during the Class Period and, upon information and belief, was a member of the Administrative Committee during the Class Period.  On or about July 12, 2010, Defendant Hamby signed the 2009 Form 5500 on behalf of the Company as Plan Administrator.  Upon information and belief, Defendant Hamby was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

**Additional "John Doe" Defendants**

26.    To the extent that there are additional Company officers, directors and employees who were fiduciaries of the Plan during the Class Period, including members of the Administrative Committee, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 1-10 include other individuals,

including Company officers, directors and employees, who were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## THE PLAN

27.     The Plan is an "employee pension benefit plan," as defined by ERISA § 3(2)(A).   Specifically, the Plan is a "defined contribution plan" within the meaning of ERISA § 3(34).   The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1).   However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff.   Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

28.     Employees of the Company and its subsidiaries are eligible to participate in the Plan on the next immediate enrollment date following their employment, and are eligible to participate in the matching portion of the Plan after the completion of one year of service with the Company and/or its subsidiaries.  *See* Plan Document, § 2.2(a).

29.     During the Class Period, participants were able to contribute between 2% and 75% of their annual base salary and commissions to the Plan.   The Company's matching contribution was up to 5% of a participant's annual base

salary and commissions for those who had completed at least one year of service and had elected to make deferred contributions.   The Company could also make an additional discretionary contribution in any Plan year.  *Id.* §§ 3.1-3.6.

30.   Participants were immediately vested in their contributions to the Plan.  *Id.* § 3.1(a).  Participants would vest in the Company's matching and discretionary contributions according to the following schedule: less than one year of service—0%; less than two years of service—33%; less than three years of service—66%; more than three years of service—100%.  *Id.* § 5.5.  Participants would automatically become 100% vested upon death or disability while still an active employee of the Company.  *Id.* §§ 5.3-5.4.  Upon retirement, participants would be entitled to receive 100% of the vested account balance in a lump-sum distribution or periodic payments over a predetermined period.  *Id.* § 5.6.

31.   Participants were permitted to direct the investment of their accounts into various investment options, one of which was Company stock.  *Id.* § 8.2; *see also* § 8.3, First Amendment to the United Community Banks, Inc. Profit Sharing Plan, incorporated by reference into United Community Banks, Inc. Registration Statement (Form S-8) (April 24, 2002), referred to herein as "First Amendment" and attached as Exhibit B hereto.

32.     Under the terms of the Plan Document, Company stock was not a required investment option; rather, the Company had discretionary authority to change or eliminate the investment alternatives offered under the Plan. Specifically, the Plan Document provides that "the separate Investment Funds made available under the Plan may be changed, eliminated or modified by the Company (or its designee)." *See* Plan Document, §8.2(b).

33.     Moreover, the Plan fiduciaries were given ample discretion under the Plan with regard to removal of the Company stock as an investment option and/or limiting investment of Plan assets in the Company stock.  For example, the Plan Document provides that:

> ***Except as may be limited by the Plan Administrator in its discretion***, Participants shall have the option to direct the investment of the amounts credited to their Pre-Tax Account and/or Employer Contribution Account in Holding Company Stock.  The Plan Administrator may establish limits on what percentage of a Participant's Pre-Tax Account and/or Employer Contribution Account may be invested in Holding Company Stock and shall communicate any such limitations in writing to Participants from time to time.

*See* First Amendment, § 8.3(a) (emphasis added).

34.     The Plan Document further provides that:

> The Plan Administrator may establish from time to time restrictions or limitations on transfers into or out of any

13

"employer stock" Investment Fund, including restrictions or limitations on any distributions or withdrawals under Article V. ***The Company (or its designee) may at any time, because of securities law restrictions or other legal restrictions, direct the Trustee to cease purchases and sales of Holding Company Stock by the "employer stock" Investment Fund***.

See *Id.* (emphasis added).

35.     The Plan's holdings of Company stock during the relevant time period are indicated below:[1]

| Date: | Stock Price | UCBI stock held by Plan | Value of UCBI stock held by Plan |
|---|---|---|---|
| December 31, 2007 | $15.80/share | 1,415,415 shares | $22,363,557 |
| December 31, 2008 | $13.58/share | 1,496,404 shares | $20,321,166 |
| December 31, 2009 | $3.39/share | 1,765,542 shares | $5,985,187 |
| December 31, 2010 | $1.95/share | 2,276,544 shares | $4,439,261 |

*See* United Community Banks, Inc., 2007-2010 Annual Reports for the Plan (Form 11-K), available at www.sec.gov.

---

[1] On June 17, 2011, the Company announced a 1-for-5 reverse stock split of its common stock and non-voting common stock effective at the close of business that day. *See United Community Banks, Inc. Announces Effectiveness of Reverse Stock Split* (June 17, 2011) available at: http://ir.ucbi.com/releasedetail.cfm?ReleaseID=585838.

36.    Since 2002, and, notably, continuing after the Company's stock became an imprudent investment option, the Company has steadily increased the number of shares that may be issued under the Plan.  *See* United Community Banks, Inc., Registration Statement (Form S-8) (April 24, 2002); United Community Banks, Inc., Registration Statement (Form S-8) (August 1, 2007); United Community Banks, Inc., Registration Statement (Form S-8) (June 15, 2009); United Community Banks, Inc., Registration Statement (Form S-8) (May 28, 2010), attached as Exhibit C hereto.

## DEFENDANTS' FIDUCIARY STATUS

37.    During the Class Period, upon information and belief, each Defendant was a fiduciary of the Plan, either as a named fiduciary or as a *de facto* fiduciary with discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

38.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

39.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus a person is a fiduciary to the extent

"(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

40.     Each of the Defendants was a fiduciary -- either as a named fiduciary or *de facto* fiduciary -- with respect to the Plan and owed fiduciary duties to the Plan and its participants under ERISA in the manner and to the extent set forth in the Plan documents and under ERISA.

41.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

42.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set

forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

43.     Upon information and belief, instead of delegating all fiduciary responsibility for the Plan to external service providers, the Company chose to assign the appointment and removal of fiduciaries, such as the members of the Administrative Committee, to itself.

44.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

45.     During the Class Period, all of Defendants acted as fiduciaries of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

**UCBI's Fiduciary Status**

46.     During the Class Period, UCBI was a named fiduciary of the Plan. *See* Plan Document, § 1.22.

47.    The Company was responsible for appointing, monitoring and, if necessary, removing the members of the Administrative Committee.  *Id.* at §§ 7.1 and 7.2.

48.    The Company had discretionary authority to change or eliminate the investment alternatives offered under the Plan.  Specifically, the Plan Document provides that "the separate Investment Funds made available under the Plan may be changed, eliminated or modified by the Company (or its designee)."  *Id.* at §8.2(b).

49.    Additionally, during the Class Period, the Company exercised control over the activities of its employees that performed fiduciary functions with respect to the Plan, including the Administrative Committee Defendants, and, could hire, appoint, terminate, and replace such employees at will.  Thus, the Company was responsible for the activities of its employees through traditional principles of agency and *respondeat superior* liability.  Under basic tenets of corporate law, the Company is imputed with the knowledge that the individual Defendants had regarding the misconduct alleged herein, and, like the fiduciaries who acted on the Company's behalf, had knowledge of the imprudent actions alleged herein.

50.    In addition to being a named fiduciary of the Plan, UCBI was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21),

in that it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**Director Defendants' Fiduciary Status**

51.     UCBI, as a corporate entity, cannot act on its own without any human agent, representative or actor.  In this regard, during the Class Period, UCBI relied upon and continues to rely directly upon the Director Defendants to carry out its fiduciary responsibilities under the Plan and ERISA.

52.     The Board bore responsibility for appointing, monitoring and, if necessary, removing members of the Administrative Committee, the designated Plan Administrator.  *Id.* at § 7.2.  Accordingly, the Board had ultimate oversight of the Plan.

53.     The Plan Document expressly provided that:

> a.     the Board was responsible for appointing the Administrative Committee;
>
> b.     any member of the Administrative Committee may be removed at any time by action of the Board; and
>
> c.     in the event of the removal or resignation of a member of the Administrative Committee, the Board was responsible for appointing a replacement member.

*Id.* at § 7.2.

54.    The Board had discretionary authority to change or eliminate the investment alternatives offered under the Plan. *Id.* at § 8.2(b).

55.    The Director Defendants were fiduciaries of the Plan, within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**The Administrative Committee Defendants' Fiduciary Status**

56.    The Administrative Committee was a named fiduciary of the Plan. *Id.* at § 1.22.

57.    The Administrative Committee was the designated "Plan Administrator." *Id.* at §§ 7.1 and 7.2.

58.    Under the terms of the Plan Document, Company stock was not a required investment alternative; rather, the Plan expressly provided that "the separate Investment Funds made available under the Plan may be changed, eliminated or modified by the Company (or its designee)." *Id.* at §8.2(b).

59.     Further, the Plan Administrator was obligated to monitor the prudence

of Company stock as a Plan investment and, if necessary, take action to protect the

Plan's assets.  Specifically, the Plan Document provides that:

> ***Except as may be limited by the Plan
> Administrator in its discretion***, Participants shall have
> the option to direct the investment of the amounts
> credited to their Pre-Tax Account and/or Employer
> Contribution Account in Holding Company Stock. The
> Plan Administrator may establish limits on what
> percentage of a Participant's Pre-Tax Account and/or
> Employer Contribution Account may be invested in
> Holding Company Stock and shall communicate any
> such limitations in writing to Participants from time to
> time.

*See* First Amendment, § 8.3(a) (emphasis).

60.     The Plan Document further provides that:

> The Plan Administrator may establish from time to
> time restrictions or limitations on transfers into or out of
> any "employer stock" Investment Fund, including
> restrictions or limitations on any distributions or
> withdrawals under Article V. ***The Company (or its
> designee) may at any time, because of securities law
> restrictions or other legal restrictions, direct the Trustee
> to cease purchases and sales of Holding Company
> Stock by the "employer stock" Investment Fund***.

*See Id.* (emphasis added).

61.     During the Class Period, in addition to being named fiduciaries of the

Plan, the Administrative Committee and its members were *de facto* fiduciaries of

21

the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), because they exercised discretionary authority or discretionary control over the management of the Plan, exercised authority or control over the management or disposition of the Plan's assets, and/or had discretionary authority over or discretionary responsibility for the administration of the Plan.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

62.   ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants, which includes the duty to speak truthfully to its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries. "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA."  *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996).

63.   Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct inaccurate or misleading information provided by others so that plan participants will not be injured.  *See*, *e.g.*, *Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001) ("[An] ERISA fiduciary that knows or should have known that a beneficiary labors under a material misunderstanding of

22

plan benefits that will inure to his detriment cannot remain silent – especially when that misunderstanding was fostered by fiduciary's own material representations or omissions.").

64.     During the Class Period, upon information and belief, the Company made direct and indirect communications with the Plan's participants including statements regarding investments in Company stock.   These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions ("SPDs") and/or prospectuses regarding Plan/participant holdings of Company stock) which included and/or reiterated these statements.   Upon information and belief, at all times during the Class Period, UCBI's SEC filings were incorporated into and part of such SPDs and/or prospectuses.   Defendants acted as fiduciaries to the extent of their communications with Plan participants.

65.     Further, as fiduciaries, Defendants knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press,[2] concerning investment in company stock, including that:

---

[2] *See* David K. Randall, *Danger in Your 401(k)*, Forbes.com (August 30, 2010) (available at: http://www.forbes.com/forbes/2010/0830/health-retirement-savings-erisa-danger-in-401k_print.html); Liz Pulliam Weston, *7 Ways to Mess Up Your 401(k)*, MSN.com (December 31, 2007) (available at:

a.      Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

b.      Out of loyalty, employees tend to invest in company stock;

c.      Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

d.      Employees tend not to change their investment option allocations in the plan once made;

e.      No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

f.      Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

g.      Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with its rewards.

---

http://articles.moneycentral.msn.com/RetirementandWills/InvestForRetirement/7MostCommon401kBlunders.aspx); Joanne Sammer, *Managed Accounts: A new direction for 401(k) plans*, Journal of Accountancy, Vol. 204, No. 2 (August 2007) (available at: http://www.aicpa.org/pubs/jofa/aug2007/sammer.htm); Roland Jones, *How Americans Mess Up Their 401(k)s*, MSNBC.com (June 20, 2006) (available at: http://www.msnbc.msn.com/id/12976549/) ; Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001) (available at: http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plan - the importance of plan design*, Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at: http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

66.   Even though Defendants knew or should have known these facts, and even though Defendants knew of the substantial investment of the Plan's funds in Company stock, they took no action to protect the Plan's assets from their imprudent investment in Company stock.

## SUBSTANTIVE ALLEGATIONS

67.   UCBI describes itself as a bank holding company headquartered in Blairsville, Georgia, that conducts substantially all of its operations through a community-focused operating model of 27 separate "community banks."   As of December 31, 2010, UCBI operated at 106 locations in Georgia, North Carolina and Tennessee.   *See* United Community Banks, Inc., Annual Report (Form 10-K) (March 16, 2011).

68.   Through its banking subsidiaries, the Company offers a full range of retail and corporate banking services, including checking, savings, and time deposit accounts, secured and unsecured loans, wire transfers, brokerage services, and other financial services.   *Id.*   The Company's primary subsidiary is the Bank, which specializes in providing community banking services to individuals and small to mid-sized businesses.   *Id.*

69.   Throughout the relevant time period, UCBI has been heavily involved in residential and commercial construction lending.   As of December 31, 2007,

25

such loans collectively constituted 40% of the Company's loan portfolio. *See* United Community Banks, Inc., Annual Report (Form 10-K) (February 29, 2008), at 5.

70.    Because they are intended to fund development projects while they are being constructed, construction loans to developers are among the most risky types of real estate loans to make.   Deutsche Bank has referred to such loans as "without doubt, the riskiest commercial real estate loan product." *See* Paul Wiseman, *The Worst Real Estate Bet Today: Construction Loans*, USAToday.com (August 20, 2010), attached as Exhibit D hereto.   The U.S. Congressional Oversight Panel has cautioned that construction loans have deteriorated faster and inflicted bigger losses on banks than any other real estate loans. *See id.*

71.    Such loans are inherently risky, as developers may encounter unanticipated problems or economic difficulties.   For instance, a project may not be completed or, once completed, may not find the market the developer had anticipated.   These risks are magnified during an economic downturn, particularly one which negatively affects the housing market to the extent that occurred in the years prior to the Class Period.

72.    During the well-documented housing boom, UCBI chose to take a very risky gamble.   Rather than spread credit risk within its residential construction

loan portfolio across a wide and diverse geographical area, the Company chose to overly focus its residential construction lending in the Atlanta metropolitan area—one of the areas hardest hit by the housing downturn. *See, e.g.*, Jonathan Sweet, *Atlanta Hit Hard by Downturn*, HousingZone.com (April 1, 2009), available at: http://www.housingzone.com/business-management/atlanta-hit-hard-downturn.

73.     As a result, UCBI was dangerously overexposed to loan losses in its residential construction portfolio.   As The Atlanta Journal-Constitution later observed:

> In the boom years, metro Atlanta's robust housing market was great for the balance sheets of many financial institutions. But too much exposure — **61 percent of United Community's bad residential construction loans were in metro Atlanta** — proved to be bad with the slightest economic hiccup.

*See* Péralte C. Paul, *United Community Banks Reports $40M Loss*, The Atlanta Journal-Constitution   (October   6,   2008),   available   at: http://www.ajc.com/business/content/business/stories/2008/10/06/united_community_bank.html# (emphasis added).

74.     Defendants knew or should have known that UCBI was exposed to substantial losses in the event that the housing bubble burst—with a predictable

devastating effect upon the Company's loan portfolios, its financial condition, and the Plan's significant holdings of UCBI stock.

75.     Beginning at least as early as 2006, the real estate bubble began to burst and housing prices began to fall dramatically, as indicated below:



76.     On October 26, 2006, the U.S. Census Bureau released a report showing that home builders were being forced to cut prices in order to sell homes. On the same day, during a conference in Washington, D.C., David Seiders, chief economist of the National Association of Home Builders, predicted, for the first time in ten years, a drop in the price of single-family homes.

77.     The following day, on October 27, 2006, leading construction industry analyst McGraw-Hill Construction released a closely-watched report forecasting

the first decline in overall construction spending since 1991.  As the Wall Street

Journal reported:

> The unexpectedly rapid decline of the nation's housing
> market will mean an overall drop in construction
> spending next year, with spillover effects in areas such as
> job growth and real-estate development…Some of the
> negative effects from the housing slump are likely to
> linger well into 2007 and perhaps much longer.

*See* Alex Frangos, *Housing Decline Sparks Slowdown in Construction*, Wall

Street Journal (October 27, 2006), available at:

http://online.wsj.com/article/SB116191573939805588.html ?mod=djemalert.

79. 78.    As one expert noted:

> At the peak of the housing boom in 2005, home building
> contributed more than $768 billion to the U.S. economy.
> In 2007 this contribution shrunk to $641 billion, a 16.6
> percent decline, and the slide continued further in the
> first quarter of 2008.  In real terms (*i.e.*, adjusted for
> inflation) the decline from 2005 to 2007 was an even
> more dramatic 20.8 percent.  When calculated from the
> peak final quarter of 2005 to the current bottom in the
> first quarter of 2008 it registers an even more striking
> 33.9 percent decline.

*See* Natalia Siniavskaia, Ph.D., *The Effect of the Home Building Contraction on

State Economies*, HousingEconomics.com (August 1, 2008), available at:

http://www.nahb.org/generic.aspx?sectionID=734&genericContentID=99676&cha

nnelID=311.

In July 2007, Freddie Mac Chief Economist Frank Nothaft predicted that U.S. home sales in 2007 would drop to their lowest level since the start of the five-year housing boom.  *See* Kathleen M. Howell, *U.S. Housing Sales Tumble to Six-Year Low on Rates*, Bloomberg.com (July 9, 2007), available at: http://www.bloomberg.com/apps/news?pid=21070001&sid =aH3.IwJhFk_w.

79.    In October 2007, U.S. Treasury Secretary Henry Paulson warned that the woes of the U.S. housing market could lead to over one million foreclosure notices for homeowners in 2007 alone.  *See Housing woes take bigger toll on economy than expected: Paulson*, AFP (October 16, 2007), available at:

http://afp.google.com/article/ALeqM5hWSjWmGJ4YXTh3PM5kOC7csTT48g.

80.    By the end of 2007 and the beginning of 2008, the perils facing the construction industry were clear, as new construction across the United States had suffered a steady decline, as indicated below:









Data source: U.S. Census Bureau (Department of Commerce).
Charts: Reed Construction Data – CanaData.

*Source*: Reed Construction Data.

81.    Analysts predicted that this trend would continue into 2008.  *See, e.g.*,

Alex Chadwick, *Regional Housing Starts End Badly in 2007*, Reed Construction

Data (February 12, 2008), available at:

http://www.reedconstructiondata.com/construction-forecast/news/2008/02/

regional-housing-starts-end-badly-in-2007/.

82.    As a result, by the end of 2007, developers were increasingly defaulting on construction loans.  As Defendants knew or should have known, this would prove to be particularly problematic for UCBI given the Company heavy exposure to losses from construction loans in the Atlanta metropolitan area as the anticipated demand for new housing plummeted.  UCBI was left with a large portfolio of construction loans that would rapidly lose value.  The Company faced a plethora of problems, including a substantially increasing level of non-performing assets, mounting loan losses and a weakening capital position.

83.    The Company was clearly in trouble and Defendants knew or should have known that the value of UCBI stock would suffer as a result.  Rather than take action to protect the Plan's substantial investment of participant's retirement savings in UCBI stock, Defendants stood idly by as the Company's problems increased and the value of the Plan's investment in Company stock was decimated.

84.    Defendants did not act prudently when they continued to permit the Plan to invest in UCBI stock and maintained the Plan's existing investments in such stock.  Defendants knew or should have known that Company stock was an imprudent investment for the Plan but failed to protect the Plan's participants' retirement savings from being imprudently invested in Company stock.

85.    As a result of Defendants' imprudent conduct, the Plan suffered millions of dollars in losses.  A prudent fiduciary facing similar circumstances would not have stood idly by as the Plan suffered such catastrophic losses.

**The Company's Troubles Were or Should Have Been**
**Apparent to Defendants at Least as Early as Mid-2008, Yet**
**Defendants Took No Action to Protect the Plan's Assets**

86.    As described above, UCBI's residential construction loan portfolio was heavily concentrated in the high-risk Atlanta metropolitan area.  On or about July 17, 2008, Atlanta journalists reported that home construction in the Atlanta metropolitan area had fallen to a 17-year low and, further, that:

> In Metro Atlanta, builders have scaled back in order to stay afloat. In one northwest Atlanta neighborhood, a site supervisor says most builders have stopped building entire subdivisions, opting instead to build one home, make sure it sells, then build another.

*See* Jaye Watson, *Home Construction Slowest in 17 Years*, 11alive.com (July 17, 2008), available at:

http://www.11alive.com/news/local/story.aspx?storyid=118743.

87.    In connection with the Company's July 24, 2008 earnings announcement, Defendant Tallent, while admitting that the Company knew that the uncertainties in the economy would continue and that UCBI expected to see further increases in non-performing assets and credit costs, nonetheless attempted to put a

positive spin on the situation by speaking of the Company's "solid earnings base" in spite of the challenging operating environment.  He further stated that that the Company continued to actively manage its loan portfolio, "quickly identifying problem loans and aggressively taking action to move these loans and assets off our books."  Defendant Tallent stated that the significant rise in non-performing loans came from the loan mitigation process, and that "while non-performing assets were up sharply, most loans were already classified in the prior quarter and moved to non-performing status this quarter."  Defendant Tallent then added that the Company was seeing the "mitigation of these problem assets through the collection process" and asserted that the Company remained focused on credit quality, capital and liquidity levels.  *See* United Community Banks, Inc., Current Report (Form 8-K), Exhibit 99.1 (July 24, 2008).

88.    However, the negative news would only continue.  On October 6, 2008, the first day of the Class Period, the Company's stock opened at $13.36 per share.  On this day, however, the Company announced that, due to continued credit deterioration in its residential construction portfolio, it had increased its allowance for loan losses to 1.91% of total loans.  Defendant Tallent stated that the economic pressures on the Atlanta housing market continued to impact UCBI's loan portfolio—of the $56 million in net charge-offs, 83 percent were residential

34

construction loans in the Atlanta metropolitan area. Moreover, in the third quarter, the Company saw a rise in the level of classified and non-performing assets and a steepening of discounts. *See* United Community Banks, Inc., Current Report (Form 8-K), Exhibit 99.1 (October 6, 2008).

89. During an interview on October 6, 2008, the Company's Chief Financial Officer ("CFO") admitted that the Company's residential construction loan portfolio had been overly-concentrated in the Atlanta metropolitan area. *See* Paul, *supra* (quoting CFO Rex S. Schuette).

90. Also on October 6, 2008, Sandler O'Neill & Partners banking analyst Kevin Fitzsimmons wrote that UCBI stock had "very limited upside over the next few quarters given the likelihood that the inflow of new NPAs [non-performing assets] will continue at an elevated pace and that the valuation discounts on future sales of NPAs will prove increasingly punitive." *See id.*

**Throughout 2009, the Company's Condition Steadily Worsened, Yet Defendants Still Took No Action with Respect to the Plan's Substantial Investment in Company Stock**

91. On January 5, 2009, UCBI issued an update on its credit quality for the 2008 fourth quarter. The next day, the Company's stock closed at $10.81 per share, down from its prior-day close of $12.41 per share.

92.     When the Company announced its quarterly and year-end results approximately two weeks later, the news continued to worsen.  The Company's January 23, 2009, announcement revealed a full-year 2008 loss of $63.5 million ($1.35 per diluted share), while in the fourth quarter alone the Company experienced a net loss of $46.7 million ($0.99 per diluted share).  Defendant Tallent stated that the "down economic cycle" had continued to impact the Company's credit quality, "particularly within the Atlanta residential construction portfolio."  He elaborated, stating that "the rise in non-performing assets was primarily the result of continued deterioration in the Atlanta housing market and softened demand from buyers, given the deterioration of pricing and valuations. The environment is not getting better."  Defendant Tallent further stated that he expected the challenges and elevated charge-offs would continue in the quarters ahead.  *See* United Community Banks, Inc., Current Report (Form 8-K), Exhibit 99.1 (January 23, 2009).

93.     By the time of the January 23, 2009, earnings announcement, UCBI stock had already begun a devastating slide from which it has yet to recover. Specifically, on the day of the announcement, UCBI stock closed at $6.46 per share, an approximate **50% drop** from the beginning of 2009.  The day after the announcement, UCBI stock closed at $5.90 per share.

94.    On March 3, 2009, the Company announced that shareholders would receive a dividend of one new share of common stock for every 130 shares held on March 11, 2009.

95.    On June 19, 2009, UCBI announced that the Bank had entered into an agreement with the Federal Deposit Insurance Corporation (the "FDIC") to purchase the assets and assume the deposit liabilities and secured wholesale borrowings of Southern Community Bank, which had been closed by the Georgia Department of Banking.  Notably, the Bank agreed to purchase these assets when UCBI itself was already in a dire financial condition and unable to adequately manage its own portfolio.

96.    As 2009 continued, the quarterly losses showed no signs of abatement.  On July 24, 2009, commenting on Company's second quarter results, Defendant Tallent tried to assure investors that the Company was "aggressively disposing of problem credits."   At the same time, he stated, "credit quality continues to be a primary area of focus for us, particularly within the Atlanta residential construction portfolio."   Further, Defendant Tallent stated that the Company saw a rise in all categories of non-performing assets.   Nonetheless, he stated that the Company believed its capital position was sound.  *See* United

Community Banks, Inc., Current Report (Form 8-K), Exhibit 99.1 (July 24, 2009).

On this day, UCBI stock closed at $5.78 per share.

**UCBI Began to Take Drastic Measures in Order to Obtain *Capita*l as Losses Continued**

97.     In an attempt to bolster its finances, UCBI announced on September 23, 2009 that it would conduct a public offering of $175 million of its common stock, the proceeds of which would be used to provide capital to the Bank, as well as for general corporate purposes.  *See* United Community Bank*s*, Inc., Current Report (Form 8-K), Exhibit 99.1 (September 23, 2009).  The following day, the Company announced that the offering would consist of 38,700,000 shares of common stock at $5.00 per share.

98.     Following these announcements, UCBI stock fell, closing at $5.09 per share on September 25, 2009.  The offering closed on September 30, 2009, with UCBI stock closing at $5.00 per share that day.  The final number of shares sold by the Company was 44,505,000, with gross proceeds totaling $222,500,000.

99.     On October 23, 2009, Defendant Tallent attempted to assure the public that the Company was continuing to dispose of problem credits. Nonetheless, Defendant Tallent admitted that credit quality continued to be a problem in the residential construction portfolio, adding that, "while we have seen a rise in all categories of non-performing assets, the inflow is still driven by

continued weakness in the housing and construction markets."   Regarding the recent equity offering, Defendant Tallent stated that the capital would strengthen the Company's balance sheet, "allowing us to continue to aggressively deal with problem credits."   Further, Defendant Tallent stated that the equity would position to the Company "to take advantage of once-in-a-lifetime opportunities to grow our business through organic growth, FDIC assisted transactions and customer dislocation within our markets."   *See* United Community Banks, Inc., Current Report (Form 8-K), Exhibit 99.1 (October 23, 2009).

100.   UCBI ended the year 2009 by announcing on December 29 that the Board had voted to temporarily suspend the Company's common stock dividend.

**The Company's Problems Continued Into 2010 and 2011, as the Plan's Losses Mounted**

101.   UCBI's announcement of its fourth quarter and full year 2009 financial results came on January 29, 2010.   For the full year, the Company reported a net loss of $138.6 million ($2.47 per diluted share), including a fourth quarter net loss of $39.8 million ($0.45 per diluted share).   The fourth quarter provision for loan losses was $90 million, and net charge-offs in the quarter were $84.6 million.   At the end up of the quarter, non-performing assets totaled $385 million (4.81% of total assets).   *See* United Community Banks, Inc., Current Report (Form 8-K), Exhibit 99.1 (January 29, 2010).

102.   Defendant Tallent stated that credit continued to be the UCBI's major
challenge, but that he was pleased with the decline in non-performing assets in the
quarter.  At the same time, he warned that the Company could face more difficulty
liquidating properties in the non-Atlanta markets.  *See id.*  On this day, UCBI stock
closed at $4.45 per share.

103.   On April 1, 2010, UCBI announced that it had entered into a securities
purchase agreement with Fletcher International, Ltd. ("Fletcher"), and that the
Bank had entered into an asset purchase and sale agreement with Fletcher and
certain affiliates.  Pursuant to this agreement, the Bank would sell Fletcher and the
affiliates $100 million of certain non-performing commercial and residential
mortgage loans and other real estate owned properties with an aggregate sales price
equal to the Bank's carrying value.  The Bank would receive a $10 million deposit
from Fletcher and the Bank would loan Fletcher and the affiliates $80 million to
acquire the purchased assets.  Fletcher and the affiliates would also deposit $17.5
million upon the purchase of the assets, to pre-fund the estimated three years of
interest and carrying costs.  Moreover, Fletcher would receive a $30 million
warrant to purchase common stock equivalent to junior preferred stock that would
be equal to (after exercise) 7,058,824 shares of UCBI common stock at an exercise
price of $4.25 per share.  It was said that this transaction would reduce the

Company's non-performing assets by approximately 25%. *See* United Community Banks, Inc., Current Report (Form 8-K), Exhibit 99.1 (April 1, 2010).  Ultimately, this drastic step to reduce non-performing assets was too little too late, and would not help the Company to adequately recover.

104.   On April 22, 2010, Defendant Tallent categorized the first quarter of the year as "difficult in terms of credit," but touted a sale of non-performing assets that was announced earlier that month.  At the same time, Defendant Tallent stated that the sale of some non-performing assets, while a step in the right direction, did not "put all of our challenges behind us."  *See id.*  On this da*y*, UCBI stock closed at $6.04 per share.  *See* United Community Banks, Inc., Current Report (Form 8-K), Exhibit 99.1 (April 22, 2010).

105.   On June 7, 2010, *Seeking Alpha* reported that UCBI remained on the ValuEngine List of Problem Banks.  *Seeking Alpha* reported that it would be necessary for the Bank to write-down more troubled assets and raise additional capital in order to bring their CRE and C&D assets back within regulatory guidelines. *See Predicting Bank Failures Using FDIC data and ValuEngine Screening*, Seeking Alpha (June 7, 2010), available at: http://seekingalpha.com/article/208897-predicting-bank-failures-using-fdic-data-and-valuengine-screening.

106.   Shortly after the Company's July 23, 2010, earnings announcement, analyst Jeff Davis of Guggenheim Securities lowered his 2010 earnings estimate for UCBI to a loss of $1.53 per share and put a 12-month price target of $3.50 on the stock, citing the Company's high levels of non-performing loans and "overhang from the eventual need to repay TARP." *See 10 Bank Stocks Trading Under $5*, The Street (July 30, 2010) available at: http://www.thestreet.com/_aol/story/10819882/1/10-bank-stocks-trading-under-5.html?cm_ven=AOL&cm_cat=Free&cm_pla=Feed&cm_ite=Feed.

107.   On November 4, 2010, UCBI announced in its Form 10-Q quarterly report that the Bank was operating under a memorandum of understanding ("MOU") with the FDIC and Georgia Department of Banking.  The MOU required the bank to maintain a Tier 1 leverage ratio of at least 8% and a total risk-based capital ratio of at least 10%.  It also required the Company to receive written consent from its regulators before declaring or paying dividends. *See* United Community Banks, Inc., Quarterly Report (Form 10-Q), (November 4, 2010).

108.   At the end of the year, UCBI stock was categorized as one of the twenty-five worst performing stocks on the S&P 1500.  *See Best and Worst Performing Stocks Since Lehman Bankruptcy*, Seeking Alpha (December 21,

2010), available at: http://seekingalpha.com/article/243065-best-and-worst-performing-stocks-since-lehman-bankruptcy.

109.   On January 3, 2011, UCBI announced that it had exercised or would soon exercise its rights to defer regularly scheduled interest payments on its $54.6 million of outstanding junior subordinated debentures related to its trust preferred securities.   The deferral of these payments would total $4.7 million annually. Defendant Tallent explained the need for the Bank to continue to be considered "well-capitalized," and stated that the deferral of these payments was in the long-term interest of all stakeholders.   *See* United Community Banks, Inc., Current Report (Form 8-K), Exhibit 99.1 (January 3, 2011).

110.   On February 14, 2011, UCBI announced that it would exercise its right to suspend regularly scheduled quarterly dividend payments of $2.25 million on its $180 million Cumulative Perpetual Preferred Stock, Series B, issued in connection with TARP.   *See* United Community Banks, Inc., Current Report (Form 8-K), Exhibit 99.1 (February 25, 2011).

111.   On March 16, 2011, UCBI announced that it intended to raise $380 million of capital through the purchase of a combination of UCBI common stock and mandatorily convertible preferred stock.   *See* United Community Banks, Inc., Current Report (Form 8-K), Exhibit 99.1 (March 17, 2011).

112. That same day, UCBI announced in its Form 10-K that the Bank continued to operate under MOU with the FDIC and Georgia Department of Banking, the terms of which had been disclosed in the November 4, 2010 Form 10-Q. *See* United Community Banks, Inc., Annual Report (Form 10-K), (March 16, 2011). On this day, UCBI stock closed at $1.53 per share.

113. The previously announced raising of $380 million in capital was completed on March 31, 2011. *See* United Community Banks, Inc., Current Report (Form 8-K), Exhibit 99.1 (March 31, 2011).

114. On April 28, 2011, UCBI announced dismal results for the first quarter of 2011. The quarterly net loss from continuing operations was $142.5 million ($1.57 per share), which fell short of even pessimistic analyst expectations of a loss of $1.26 per share. Provisions for loan losses increased by 154% to $190 million from the previous year, while non-performing assets stood at $138 million. *See* United Community Banks, Inc., Current Report (Form 8-K), Exhibit 99.1 (April 28, 2011). On that day, UCBI stock closed at $2.53 per share. The Company's shares traded for between $2 per share and $3 per share over the next several months and have not recovered

115.   As a result of the Company's lending practices, prior to and during the Class Period, UCBI's level of nonperforming assets increased substantially, as depicted below, resulting in a significant decline in the value of Company stock:



116.   Defendants, as fiduciaries of the Plan, were obligated to continuously ensure that the Plan's assets were prudently invested.  However, Defendants failed to do so, to the substantial detriment of the Plan and its participants.

117.   As a result of the enormous erosion in the value of Company stock, the Plan's participants, the retirement savings of whom were heavily invested in

UCBI stock, suffered unnecessary and unacceptable losses, as depicted below (adjusted to reflect 1-for-5 reverse stock split):



**Defendants Knew or Should Have Known That UCBI Stock Was an Imprudent Investment for the Plan, Yet Took No Action**

118.    During the Class Period, Defendants knew or should have known that the Company's stock was an imprudent Plan investment but did nothing to protect the heavy investment of Plan participants' retirement savings in UCBI stock.

119.    As a result of the enormous erosion of the value of Company stock, the Plan (and correspondingly the Plan's participants) suffered unnecessary and unacceptable losses.

120.   Because of their high ranking positions within the Company and/or their status as Plan fiduciaries, Defendants knew or should have known of the existence of the above-mentioned problems.

121.   Defendants knew or should have known that, due to the Company's massive exposure to losses from non-performing assets, its steadily and continuously deteriorating condition and the inevitable devastating impact upon the value of Company stock, UCBI common stock was an imprudent investment option for the Plan.  Yet Defendants failed to protect the Plan and its participants from foreseeable losses.

122.   Upon information and belief, Defendants also failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA and failed to conduct an appropriate investigation into whether UCBI stock was a prudent investment for the Plan.

123.   An adequate, or even cursory, investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in UCBI stock was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

124. Because Defendants knew or should have known that UCBI was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in UCBI stock.

125. Defendants had available to them several different options for satisfying this duty, including, among other things: divesting the Plan of UCBI stock; discontinuing further contributions to and/or investment in UCBI stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that, as a result of their employment by UCBI, they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of UCBI stock.

126. Despite the availability of these and other options, Defendants failed to take adequate action to protect participants from losses resulting from the Plan's investment in UCBI stock.  In fact, Defendants continued to invest and to allow investment of the Plan's assets in Company stock even as UCBI's problems came to light.

## At Least Certain Defendants Suffered From Conflicts of Interest

127.   UCBI's SEC filings during the Class Period, including Form DEF 14A Proxy Statements, make clear that a portion of certain employee directors' and officers' compensation was in the form of stock option awards and other equity incentives. *See, e.g.* United Community Banks, Inc., Definitive Proxy Statement (Form DEF 14A) (April 25, 2011).

128.   Because the compensation of at least some of the Defendants was significantly tied to the price of UCBI stock, certain if not all Defendants had incentive to keep the Plan's assets invested in UCBI stock.  Accordingly, such Defendants had no incentive to take any action that would adversely affect the price of UCBI stock and thereby reduce their compensation.

129.   Some Defendants may have had no choice in tying their compensation to UCBI stock (because compensation decisions were out of their hands) but Defendants did have the choice of whether to keep the retirement savings of the Plan's participants and beneficiaries tied up to a large extent in UCBI stock.

130.   These conflicts of interest put certain Defendants in the position of having to choose between their own interests as directors/executives and stockholders and the interests of the Plan participants and beneficiaries, whose

interests Defendants were obligated to loyally serve with an "eye single" to the Plan.

## CLASS ACTION ALLEGATIONS

131.   Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plan, himself and the following class of persons similarly situated (the "Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan at any time between October 6, 2008 and the present (the "Class Period") and whose Plan accounts included investments in UCBI common stock.

132.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are hundreds of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period and whose Plan accounts included investment in UCBI stock.[3]

133.   Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

---

[3] According to the 2009 Form 5500, there were over 2,000 Plan participants as of December 31, 2009.

       a.     whether Defendants each owed a fiduciary duty to the Plan, Plaintiff and members of the Class;

       b.     whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

       c.     whether Defendants violated ERISA; and

       d.     whether the Plan and members of the Class have sustained damages and, if so, the proper measure of damages.

134.   Plaintiff's claims are typical of the claims of members of the Class because Plaintiff, the Plan and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

135.   Plaintiff will fairly and adequately protect the interests of members of the Class and has retained counsel competent and experienced in class actions, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Plan or the Class.

136.   Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other

members not parties to the actions, or substantially impair or impede their ability to protect their interests.

137.   Class action status is also warranted under the other subsections of Rule 23(b) because:  (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF UNDER ERISA

138.   At relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

139.   ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

140.   ERISA § 409(a), 29 U.S.C. §1109(a), entitled "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such

plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

141.   ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

142.   These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law."  *Herman v. NationsBank Trust. Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997) (quoting *Donovan v. Bierwirth*, 680 f.2d 263, 272 n.8 (2d Cir. 1982)).  They entail, among other things:

> a.    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;
>
> b.    A duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the

participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

c.   A duty to disclose and inform, which encompasses:  (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

143.   ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

[I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

144.   Plaintiff therefore brings this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## COUNT I

## FAILURE TO PRUDENTLY AND LOYALLY MANAGE
## THE PLAN'S ASSETS (BREACHES OF FIDUCIARY DUTIES
## IN VIOLATION OF ERISA § 404 AND § 405 BY ALL DEFENDANTS)

145.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

146.   At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

147.   Under ERISA, fiduciaries who exercise discretionary authority or control over management of a Plan or disposition of a Plan's assets are responsible for ensuring that investment options made available to participants under a Plan are prudent.   Furthermore, such fiduciaries are responsible for ensuring that assets within the Plan are prudently invested.   Defendants were responsible for ensuring that all investments in the Company's stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.   Defendants are liable for losses incurred as a result of such investments being imprudent.

148.   Defendants were required, both under the Plan itself and the fiduciary obligations imposed by ERISA, to monitor the prudence of investing Plan assets in

Company stock and, if necessary, to take action to protect the Plan's assets in the event that Company stock became an imprudent investment. *See* Plan Document, §8.2(b); First Amendment, § 8.3(a).

149.   Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan.  This duty to inform participants includes an obligation to provide participants with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding Plan investments/investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.

150.   Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period these Defendants knew or should have known that the UCBI common stock was not a prudent or suitable investment for the Plan.  Investment in Company stock during the Class Period clearly did not serve the Plan's stated purpose.  Yet during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they

knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

151.   Defendants further breached their duties of loyalty and prudence by failing to divest the Plan of UCBI stock when they knew or should have known that it was not a prudent or suitable investment for the Plan.

152.   Upon information and belief, Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information to participants regarding the Company's true financial condition and the Company's concealment of the same by conveying inaccurate information regarding the Company's future outlook.  During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, and/or allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock.  As such, participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

153.   Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in, or knowingly undertaking to

conceal, each other's failure to disclose crucial information regarding the Company's operations. Defendants had or should have had knowledge of such breaches by other Plan fiduciaries yet made no effort to remedy them.

154. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment. Had Defendants taken appropriate steps to comply with their fiduciary obligations, they could have liquidated some or all of the Plan's holdings in Company stock and thereby eliminated, or at least reduced, losses to the Plan.

155. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### FAILURE TO AVOID/RESOLVE CONFLICTS OF INTEREST (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY THE EMPLOYEE DIRECTOR DEFENDANTS)

156. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

157. At all relevant times, as alleged above, the Director Defendants were fiduciaries within the Plan within meaning of ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

158.  ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty—that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

159.  The employee Director Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities.

160.  As a consequence of the employee Director Defendants' breaches of fiduciary duty, the Plan suffered millions of dollars in losses.  If the employee Director Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been substantially minimized or avoided altogether.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and

indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement savings.

161.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), the employee Director Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## COUNT III

**FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES AND PROVIDE THEM WITH ACCURATE INFORMATION (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY UCBI AND THE DIRECTOR DEFENDANTS)**

162.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

163.   This Count alleges fiduciary breaches against UCBI and the Director Defendants.

164.   At all relevant times, as alleged above, UCBI and the Director Defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

165.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of UCBI and the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the

Administrative Committee and other Company officers, employees and agents to whom fiduciary responsibilities were delegated.

166.   The duty to monitor entails both giving information to and reviewing the actions of the fiduciary appointees.  In this case, that means that the delegating fiduciaries, UCBI and the Director Defendants, had the duty to:

> a.   Ensure that the fiduciary appointees possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;
>
> b.   Ensure that the fiduciary appointees are provided with adequate financial resources to do their job;
>
> c.   Ensure that the fiduciary appointees have adequate information to do their job of overseeing the Plan's investments;
>
> d.   Ensure that the fiduciary appointees have ready access to outside, impartial advisors when needed;
>
> e.   Ensure that the fiduciary appointees maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investments; and
>
> f.   Ensure that the fiduciary appointees report regularly to the monitoring fiduciaries.  The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

167.   Under ERISA, a delegating fiduciary must ensure that the fiduciary appointees are performing their obligations, including those with respect to the

investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a delegating fiduciary must provide the fiduciary appointees with complete and accurate information in their possession that they know or reasonably should know that the appointees must have in order to prudently manage a plan and a plan's assets.

168.  UCBI and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the fiduciary appointees had access to knowledge regarding the Company's business problems alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the fiduciary appointees completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation.  UCBI and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) continuing to invest the assets of the Plan in UCBI common stock when it no longer was prudent to do so, and (ii) imprudently allowing the Plan to continue offering UCBI stock as an investment alternative.  Despite this knowledge, UCBI and the Director Defendants failed to take action to protect the Plan, and

concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

169.   In addition, UCBI and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the fiduciary appointees accurate information concerning the financial condition of UCBI that they knew or should have known that these Defendants needed to make sufficiently informed decisions.   By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

170.   UCBI and the Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the fiduciary appointees, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

171.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

172.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

173.   The Plan suffered millions of dollars in losses because Defendants caused or allowed substantial assets of the Plan to be invested, in Company stock during the Class Period at a time that Defendants knew or should have known that Company stock was not prudent.

174.   Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and its participants would have avoided a substantial portion of the losses that they suffered through the Plan's continued investment in Company stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

175.   As a consequence of Defendants' breaches, the Plan suffered significant losses.

176.   ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the

plan . . ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

177.  With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

178.  The Plan, Plaintiff and the Class are therefore entitled to relief from Defendants in the form of:  (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests

on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

179.   Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.   A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.   An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.   Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

E.      An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of UCBI maintained by the Plan in proportion to the accounts' losses attributable to the decline in UCBI's stock price;

F.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G       An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all issues so triable.

DATED: August 5, 2011.

HOLZER HOLZER & FISTEL, LLC

/s/ William W. Stone
Michael I. Fistel, Jr.
Georgia Bar Number: 262062
mfistel@holzerlaw.com
William W. Stone
Georgia Bar Number: 273907
wstone@holzerlaw.com
200 Ashford Center North
Suite 300
Atlanta, Georgia 30338
Telephone:   770-392-0090
Facsimile:    770-392-0029

KESSLER TOPAZ
MELTZER & CHECK, LLP

Edward W. Ciolko, Esq.
eciolko@ktmc.com
Mark K. Gyandoh, Esq.
mgyandoh@ktmc.com
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiff*